IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| MARGARET WELCH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04-663-KI |
| | ) | |
| vs. | ) | OPINION |
| | ) | |
| HUNTLEIGH USA CORPORATION, a | ) | |
| Missouri corporation and THE UNITED | ) | |
| STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

Christopher T. Hill
520 S. W. Sixth Avenue, Suite 1250
Portland, Oregon 97204

    Attorney for Plaintiff

Karin J. Immergut
United States Attorney
District of Oregon

Timothy W. Simmons
Assistant United States Attorney
U. S. Attorney's Office
1000 S. W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Matthew F. Denley
Stephen E. Verotsky
Cummins, Goodman, Fish Denley & Vickers, P. C.
P. O. Box 609
Newberg, Oregon 97132-0609

John B. Renick
Burton Garland
McMahon, Berger, Hanna, Linihan, Cody & McCarthy
P. O. Box 31901
St. Louis, Missouri 63131-3039

    Attorneys for Defendants

KING, Judge:

Plaintiff Margaret Welch alleges defendants Huntleigh USA Corporation ("Huntleigh") and the United States of America are liable to her in negligence, battery and under the Federal Tort Claims Act ("FTCA") for an injury she received while going through a security checkpoint at the Portland International Airport ("PDX"). Before the court is the United States of America's Motion to Dismiss (#31). For the reasons stated below, I dismiss Welch's battery claim against the United States but allow the other claims to proceed to trial.

## FACTS

I. <u>Accident</u>

On April 16, 2002, Welch was going through a security checkpoint for Concourse C at PDX when a Huntleigh employee, Vanessa Strong, pushed Welch's suitcase and injured Welch's

wrist, hand, and finger. Welch alleges she suffered $50,000 in economic damages and $300,000 in non-economic damages.

II.     Notice

The incident which is the subject of the Complaint occurred on April 16, 2002. Mr. Hill, Welch's attorney, sent letters to U.S. Customs and Border Protection, the U.S. Department of Homeland Security, the U.S. Department of Transportation, the Federal Aviation Administration, the Port of Portland, and Huntleigh dated April 14, 2004, to give formal notice of Welch's claim. Lorenzo Kenserson, from Washington Pre-Trial Services, Inc., certifies that he executed service of process upon an Authorized Representative from the U.S. Department of Transportation, the U.S. Department of Homeland Security, the Federal Aviation Administration, and U.S. Customs and Border Protection on April 15, 2004. The U.S. Immigration and Customs Enforcement agency ("ICE") received a letter from Welch on April 26, 2004. ICE forwarded the letter to the Transportation Security Administration ("TSA") on April 27, 2004. TSA received its first copy of Welch's claim letter on May 3, 2004.

III.    Control

On February 15, 2002, TSA awarded Huntleigh a contract to provide security screeners at thirty-seven airports, including PDX. Huntleigh performed all passenger screening functions at PDX from February 15, 2002, until October 22, 2002. At that time, TSA assumed authority over passenger screening at PDX.

The contract between Huntleigh and TSA provided that Huntleigh must "furnish all labor, supervision, and management necessary to provide screening services" at PDX. Decl. of Counsel in Supp. of Pl.'s Resp. to USA's Mot. to Dismiss, Section C, 1.0. The contract also provided that

Huntleigh "shall provide adequate on-site supervision of all employees at all times that a screening location is manned" at PDX. Section C, 2.2. The contract required Huntleigh to comply with the government's changes in training procedures but provided that if "such revision changes the time, schedule or cost of performance" under the contract, Huntleigh was able to request reimbursement for the additional costs. Section C, 2.5.2. It also set forth numerous hiring requirements and forbade Huntleigh from taking adverse personnel actions against its own employees without first notifying the government's technical officer. Section H, Special Contract Requirements H.9 and H.11. The contract required that Huntleigh comply with the standard operating procedures. Section C, 1.0(a). The contract required Huntleigh to "arrange for continuous supervisory observation and evaluation of all screening personnel and take appropriate corrective measures for all infractions noted in the course of performing assigned screening duties." Section C, 2.5.3.

The United States has a specific statutory duty to supervise security screening of all passengers and property by uniformed federal personnel under 49 U.S.C. § 44901(b). The notes, under the headline of "Deadline for Deployment of Federal Screeners", indicates that "[n]ot later than 1 year after the date of enactment of this Act [Nov. 19, 2001]" the Secretary shall deploy a sufficient number of federal screeners. 49 U.S.C. § 44901.

Andrew Coose, the Deputy Federal Security Director at PDX, states in his Declaration that there were no TSA employees working at PDX in April of 2002. There were FAA employees on site who provided regulatory oversight and instruction regarding passenger screening but they did not supervise or perform screening. Coose states the FAA employees also attended security briefings and patrolled security checkpoints until TSA assumed those

Page 4 - OPINION

responsibilities. Under law, Huntleigh was required to have one of its own employees, known as a Ground Security Coordinator, at the screening checkpoint to manage the checkpoint; the FAA's job was to make sure that person was present and managing the checkpoint.

Hoyt Martin, a Certified Training Manager with Huntleigh, states in his Declaration that TSA had a real and significant physical presence at PDX. TSA employees exercised substantial supervision over passenger screening, including positioning themselves at security checkpoints to supervise the daily screening operations, during the time of the contract with Huntleigh. According to Martin, TSA employees were physically present to ensure proper "wanding" protocol procedure, to enforce compliance with the regulation limiting passengers to two carry-on bags, and to answer any security-related questions or issues from Huntleigh employees.

Coose states TSA did not have a physical presence at PDX at the time of the accident. He also states that prior to August 19, 2002, TSA employees were not physically present at passenger screening checkpoints and that neither TSA nor FAA employees supervised the daily activities of Huntleigh employees. According to Coose, supervision consisted of the FAA informing Huntleigh management of any improper screening activities observed. Martin states that TSA employees would contact Huntleigh management if a Huntleigh employee was not performing according to TSA regulations.

Martin also declares that TSA employees randomly attended the training sessions he conducted to ensure that Huntleigh employees were being given proper instructions. Coose states in his Declaration that prior to August 19, 2002, TSA personnel did not attend training sessions given to Huntleigh employees concerning the implementation of TSA regulations but that FAA personnel did randomly attend training sessions. Simon Robinson, General Manager of

Page 5 - OPINION

Huntleigh's Portland Office, states in his Declaration that the TSA regularly issued new directives for Huntleigh personnel regarding how to conduct the security screening operations. He also states that if Huntleigh received any passenger complaints concering how security checkpoints were operated, they were instructed by TSA to give passengers an "800" telephone number, which routed complaints to an office operated pursuant to the direction of TSA.

## DISCUSSION

I. <u>Notice</u>

The United States claims TSA did not receive notice of the complaint until May 3, 2004, after the statute of limitations had run. A claim is presented when the agency receives a facially sufficient, written statement of claim. 28 C.F.R. § 14.2(a). A claim delivered to the wrong agency is deemed presented when received by the appropriate agency. 28 C.F.R. § 14.2(b)(1). Notice to a parent agency is good notice to a subordinate agency. <u>See</u> <u>In re U.S. Atmospheric Testing Litigation</u>, 820 F.2d 982, 999-1000 (9th Cir. 1987) (notice to Dept. of Energy insufficient for claim by Marine, notice needs to be to Dept. of Defense); <u>Ames v. U.S.</u>, 600 F.2d 183, 185 n.4 (8th Cir. 1979) (claim needed to be filed with Dept. of Treasury, of which IRS is a part, not Dept. of Justice).

Welch provided notice to the U.S. Department of Homeland Security on April 15, 2004, as evidenced by the affidavit of service. The claim should have been delivered to TSA. Since the U.S. Department of Homeland Security is the parent agency of TSA, notice was timely. The United States' motion to dismiss because the action is time-barred is denied.

II. <u>Federal Tort Claims Act Statutory Exceptions</u>

Page 6 - OPINION

A. Standard of Review

When considering a motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1), the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction. McCarthey v. United States, 850 F.2d 558, 560 (9th Cir. 1988). Considering extrinsic evidence in a motion to dismiss for lack of subject matter jurisdiction does not render the motion one for summary judgment.

B. Independent Contractor Exception

The Aviation and Transportation Security Act ("ATSA"), Pub. L. 107-71, 115 Stat. 597, was signed into law on November 19, 2001. The law created the TSA to protect the nation's transportation systems, and expressly provided for federal employees to conduct security screening functions. Prior to the enactment of the ATSA, federal law assigned the responsibility for passenger screening to the airlines and security screening was performed by employees of private security firms.

The alleged incident occurred after the ATSA was signed into law but before the government took over security screening functions. Therefore, Welch brought suit against both Huntleigh and the United States. To proceed with a suit against the United States, there must be a waiver of sovereign immunity. Federal Deposit Insurance Corp. v. Meyer, 510 U.S. 471, 475 (1994). The FTCA includes a limited waiver of sovereign immunity. The waiver in the FTCA limits the government's liability to negligent or wrongful acts committed by employees of the Government while acting within the scope of their employment. 28 U.S.C. §§ 1346(b)(1), 2679. The definition of employee under 28 U.S.C. § 2671 includes employees of any federal agency

and persons acting on behalf of a federal agency in an official capacity. The definition of federal agency specifically excludes any contractor with the United States. Id. Under the FTCA, the government can not be held vicariously liable for the negligence of an employee of an independent contractor. Yanez v. United States, 63 F.3d 870, 872 (9th Cir. 1995). However, the United States is liable for the negligence of an independent contractor if the government had authority to control the detailed physical performance of the contractor and exercised substantial supervision over its day-to-day activities. Laurence v. Department of the Navy, 59 F.3d 112, 113 (9th Cir. 1995) (citing United States v. Orleans, 425 U.S. 807, 814-815 (1976)).

There appears to be some confusion on whether FAA or TSA employees performed particular tasks at PDX at the time of the accident. Coose states that FAA employees were at PDX then to provide regulatory oversight and instruction, to attend security briefings, to patrol security checkpoints, to randomly attend training sessions, and to inform Huntleigh of any improper screening activities. Martin states that TSA employees were at security checkpoints in PDX to supervise the screening operations by ensuring proper wanding procedures, enforcing the carry-on bag limitation, and answering security-related questions from Huntleigh employees. According to Martin, TSA employees randomly attended the training sessions he conducted to ensure that the instruction was correct and contacted Huntleigh management if a Huntleigh employee was not following TSA regulations. Whether these tasks were performed by FAA or TSA employees, what is important is that the tasks were performed by a federal employee. They cause me to conclude that the United States exercised substantial supervision over Huntleigh's daily activities.

Page 8 - OPINION

The contract between the parties also demonstrates the control the government retained over Huntleigh. The contract required Huntleigh to comply with all of the government's changes in training procedures and forbade Huntleigh from taking adverse personnel actions against its own employees without first notifying the government. The government also had the ability to control how Huntleigh performed its work through the standard operating procedures manual, which the TSA and FAA produced in cooperation.

The government relies on the contract, which provided that Huntleigh must furnish all labor, supervision, and management necessary to provide screening, to show that it did not control Huntleigh's daily activities. The contract also stated that Huntleigh shall provide adequate on-site supervision of employees when screening locations are manned. Even though Huntleigh was required, by contract, to supervise screening stations, federal employees also supervised those stations. The government utilizes Loque v. United States, 412 U.S. 521 (1973), to support its position that the United States did not control the day-to-day activities of Huntleigh employees. In Loque v. United States, the parents of a federal prisoner who committed suicide while confined in a local jail brought a wrongful death action against the government. Id. The Supreme Court found that the independent contract defense applied because the contractor controlled the day-to-day operations of the contractor's facilities, while the government paid high rates to induce the contractor to do a good job. Id. In that case, the County undertook to provide custody in accordance with the Bureau of Prisons' Rules and Regulations governing the care and custody of prisoners. Id. at 530. The United States had no authority to physically supervise the conduct of the jail's employees, the United States only had the right to enter the institution at reasonable hours for the purpose of inspecting the conditions under which the federal offenders

were housed.  Id.  Thus, Loque is distinguishable because the United States did not have the
ability to supervise daily activities in the county prison.  Government supervision in Loque only
included paying the county for the service and prescribing rules and regulations.  In this case, the
government was physically present and supervising both the security stations and training
sessions in addition to prescribing regulations.

Huntleigh was an independent contractor with the United States.  However, the United
States is liable for the negligence of Huntleigh employees because the United States exercised
substantial supervision over the day-to-day activities of Huntleigh.

  C. Battery Exception

The FTCA constitutes a waiver of sovereign immunity, except in particular instances,
listed in 28 U.S.C. §§ 2680 (a)-(h).  Subsection (h) specifically excepts any claim arising out of
assault or battery from the FTCA waiver of immunity.  However, the waiver of immunity will
apply, and the claim can be prosecuted, for any claim arising out of assault and battery with
regards to acts or omissions of an investigative or law enforcement officer of the United States
government.  Id.  A law enforcement officer is defined as "any officer of the United States who is
empowered by law to execute searches, to seize evidence, or to make arrests for violations of
Federal law."  Id.

Employees of Huntleigh did not have the authority to execute searches, seize evidence, or
make arrests for violations of Federal law.  Andrew Coose stated in his Declaration that screeners
are able to conduct consensual administrative searches for items which are prohibited entry into
the airport's sterile areas.  Screeners do not have the authority to detain individuals and must call
law enforcement officers to search, seize, and arrest individuals if illegal items are found.

Screeners also do not have the authority to seize items that are prohibited. When a prohibited item is found, the screener gives the passenger the option of disposing of the item, leaving the item with someone, taking the item back to their vehicle, or abandoning the item. Since the Huntleigh screeners were only able to perform consensual searches, and had no authority to arrest, they cannot be considered law enforcement officers for the purpose of the FTCA. See Wilson v. United States, 959 F.2d 12, 15 (2nd Cir. 1992) (parole officers are not investigative or law enforcement officers under the FTCA because they may only seize contraband in plain view with the parolee's consent and thus, lack the seizure power contemplated by section 2680(h)). The United States may not be held liable for the alleged battery of Huntleigh screeners because the United States has not waived sovereign immunity with respect to such a claim.

## CONCLUSION

Defendant United States' Motion to Dismiss (#31) is granted in part. Welch's second claim for battery against the United States is dismissed but may proceed against Huntleigh. Welch's other claim against the United States may proceed to trial.

Dated this ___4th___ day of August, 2005.

     /s/ Garr M. King
    Garr M. King
    United States District Judge